**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
MARK SOLIMAN,

                                  Plaintiff,

            - against -

DAIMLER AG, MERCEDES-AMG GMBH,
MERCEDES-BENZ USA, LLC, PROGRESSIVE
NORTHEASTERN INSURANCE COMPANY,

                               Defendants.
------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

CV 10-408 (SJF) (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

I.     P<small>RELIMINARY</small> S<small>TATEMENT</small>

       Mark Soliman ("Plaintiff" or "Soliman"), appearing *pro se*, filed a Second Amended

Complaint against Daimler AG ("Daimler"), Mercedes-AMG GmbH ("Mercedes"), Mercedes-

Benz USA, LLC  ("MBUSA"), and Progressive Northeastern Insurance Company

("Progressive") in connection with an auto accident involving the Plaintiff.  Defendants Daimler,

Mercedes and MBUSA (collectively "Defendants") now move for summary judgment pursuant

to Fed. R. Civ. P. 56.[1]  This motion has been referred to me by Judge Feuerstein for a Report and

Recommendation.  Based upon my review of the record, the arguments advanced by both parties

in their written submissions and the applicable law, I respectfully recommend to Judge

Feuerstein that Defendants' motion for summary judgment be GRANTED.

---

[1]      Defendant Progressive's previous motion to dismiss the Complaint was granted and
Progressive is no longer a party to this action.

## II.    STATEMENT OF FACTS

For purposes of deciding Defendants' motion for summary judgment, the following facts are taken from the parties' affidavits, exhibits and Defendants' Local Rule 56.1 Statement of Undisputed Facts ("Defs.' 56.1 Stmt.").[2]

### A.    The Accident

At approximately 3:18 a.m. on the morning of June 11, 2006, a head-on collision occurred on Quaker Meeting House Road in Nassau County between a 2003 Mercedes Benz CL 55 ("CL 55") driven by Don Bonifazio and a 1999 Lincoln stretch limousine driven by Anthony Verdecchia. *See* Decl. of John P. Hannigan in Supp. of Defs.' Mot. for Summ. J. ("Hannigan Decl."), Ex. C (Nassau County Police Report of June 11, 2006 accident).  Quaker Meeting House Road is a two lane winding roadway one mile in length divided by a double yellow line with a posted speed limit between 25-30 miles per hour.  Defs.' 56.1 Stmt. ¶ 1; Hannigan Decl., Ex. C.  Along with Don Bonifazio, Plaintiff and Wayne Forman were occupants of the CL 55.  As a result of the accident, Don Bonifazio and Wayne Forman were fatally injured.  Plaintiff Soliman survived but suffered fractures to his left leg and to both bones in his left forearm.  He

---

2       The Court notes that Plaintiff did not file and serve a response to Defendants' 56.1 Statement, in violation of Local Rule 56.1.  Although a plaintiff's failure to respond or contest the facts set forth in a Rule 56.1 statement generally constitutes an admission of those facts, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules."  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted); *Viscusi v. Proctor & Gamble*, No. 05-CV-01528, 2007 WL 2071546, at *9 n.1 (E.D.N.Y. July 16, 2007) (exercising discretion to not deem admitted defendant's unchallenged statement of undisputed facts given plaintiff's *pro se* status).  In exercising its discretion and in light of Plaintiff's *pro se* status, the Court will overlook Plaintiff's defect and "will deem admitted only those facts that are supported by admissible evidence and not controverted by other admissible evidence in the record."  *Roman v. Nat'l Sec. Agency*, No. 07-CV-4502, 2009 WL 303686, at *2 n.1 (E.D.N.Y. Feb. 9, 2009).

also sustained a laceration to the back of his head, a concussion and a nose injury. Hannigan Decl., Ex. G (Nassau University Medical Records for Mark Soliman dated June 11, 2006).

Immediately preceding the accident, the CL 55 came up behind a vehicle driven by non-party James Clark who was traveling east bound on Quaker Meeting House Road. Defs.' 56.1 Stmt. ¶ 2. To pass the vehicle, Bonifazio pulled across the double-yellow line onto the wrong side of the road and passed Clark's vehicle. *Id.* ¶ 4. What transpired next is in dispute. Defendants state that Bonifazio passed Clark's car at a high rate of speed and did not merge back into the proper lane, resulting in a head-on collision with a limousine traveling west-bound. Defs.' 56.1 Stmt. ¶¶ 4-5; Hannigan Decl., Ex. C. According to the Plaintiff, Bonifazio merged back into the east-bound lane and slowed down immediately without incident. *See* Second Aff. of Mark Patrick Soliman in Supp. of Pl.'s Opp. to Defs.' Mot. for Summ. J. ("Soliman Aff. II"), ¶ 14. However, Plaintiff states that an automatic downshift into a lower gear lunged the subject vehicle straight into the west-bound lane of traffic causing the accident. Soliman Aff. II, ¶¶ 17-18.

## B.     The Vehicle

The 2003 Mercedes-Benz CL 55 AMG is a luxury coupe equipped with a 5.5 liter/493 horsepower/516 lb-ft V-8 engine. *See* Decl. of Lawrence Fleming in Supp. of Defs.' Mot. for Summ. J. ("Fleming Decl."), ¶ 6. The front seats of the CL 55 are equipped with integrated seat belts, meaning that the shoulder belt webbing is anchored inside the seat. Defs.' 56.1 Stmt. ¶ 16. The CL 55 is also equipped with a Supplemental Restraint System ("SRS"), comprised of the vehicle's air bag systems and Emergency Tensioning Retractors that are part of the seat belts. Defs.' 56.1 Stmt. ¶ 19; Fleming Decl. ¶¶ 7-8. The SRS also contains acceleration sensors

(accelerometers) in its Electronic Control Unit in the occupant compartment. Defs.' 56.1 Stmt. ¶ 20; Fleming Decl. ¶ 9. Lastly, the vehicle is equipped with two accelerometers at the front of the vehicle. Defs.' 56.1 Stmt. ¶ 20.

## III.   STANDARD OF REVIEW

Fed. R. Civ. P. 56(a) dictates that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of establishing the absence of any genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986); *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). To determine whether the moving party has satisfied this burden, the Court is required to view the evidence and all factual inferences arising from that evidence in the light most favorable to the non-moving party. *Doro v. Sheet Metal Workers' Int'l Ass'n,* 498 F.3d 152, 155 (2d Cir. 2007); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005).

Where the movant shows a prima facie entitlement to summary judgment, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006). "[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Id.*; *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001) ("Even where facts are disputed, in order to defeat summary judgment, the non-moving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor"). Summary

judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Dobbs v. Dobbs*, No. 06-CV-6104, 2008 WL 3843528, at *1 (S.D.N.Y. Aug. 14, 2008) ("The Court's goal should be to isolate and dispose of factually unsupported claims") (internal quotation marks omitted). However, "[i]f there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Fischl v. Armitage,* 128 F.3d 50, 56 (2d Cir. 1997) (citing *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 33 (2d Cir. 1997)).

## V.    DISCUSSION

In New York, an individual injured by an allegedly defective product may assert a claim against the manufacturer on a theory of liability grounded in contract (express or implied), negligence or strict products liability.[3] *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 106, 450 N.E.2d 204, 463 N.Y.S.2d 398 (1983). With regard to strict products liability, actions may be predicated on the assertion that the product is defective because of a manufacturing defect, a design defect, or a failure to provide adequate warnings regarding the use of the product.[4] *Voss*, 59 N.Y.2d at 106-07. In addition, a motor vehicle manufacturer's liability for design or

---

[3]    In this diversity action, New York law governs all issues presented in Defendants' motion. *See McCarthey v. Olin Corp.*, 119 F.3d 148, 153 (2d Cir. 1997).

[4]    "Strict products liability for design defect thus differs from a cause of action for a negligently designed product in that the plaintiff is not required to prove that the manufacturer acted unreasonably in designing the product. The focus shifts from the conduct of the manufacturer to whether the product, as designed, was not reasonably safe." *Voss*, 59 N.Y.2d at 107.

construction defects extends to include cases where the alleged defect did not cause the accident but enhanced the plaintiff's injuries.  *See Tiner v. General Motors Co.*, 909 F. Supp. 112, 116 (N.D.N.Y. 1995) (citing *Bolm v. Triumph Corp.*, 33 N.Y.2d 151, 350 N.Y.S.2d 644, 305 N.E.2d 769 (1973)).  These latter actions, referred to as "second collision" or "crashworthiness" cases, cover situations where the driver or passenger collides with an interior part of the vehicle subsequent to the vehicle's collision with another vehicle or object.  *Caiazzo v. Volkswagenwerk A.G.*, 647 F.2d 241, 243 n.2 (2d Cir. 1981).

Defendants point out that in the Second Amended Complaint under "causes of action," the Plaintiff only specifically alleges design flaws with respect to the CL 500 seatbelt and air bag system.  *See* Mem. of Law in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Mem.") at 4 n.2.  However, when an action involves a *pro se* plaintiff, "his or her pleadings must be considered under a more lenient standard than that accorded 'formal pleadings drafted by lawyers.'"  *Bellamy v. Mount Vernon Hosp.*, No. 07 Civ. 1801, 2009 WL 1835939, at *3 (S.D.N.Y. June 26, 2009) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)); *accord Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).  As such, the Court reads the allegation of an automatic downshift causing the subject car to lunge into the opposing lane as a separate design defect claim.[5]  This finding is supported by Plaintiff's responses to Defendants' interrogatories in which the Plaintiff stated that the defect which caused the subject collision was the "unrestricted automatic downshift capability."  Hannigan Decl., Ex. H.  Accordingly, the specific claims brought against

---

5       The Court concludes that Plaintiff's lunge theory is premised on a design defect as opposed to a manufacturing defect, since Plaintiff's arguments for a defect are not limited to the particular CL 55 involved in the accident.  Instead, Plaintiff's arguments center on a more global design defect of the CL 55, *i.e.*, the vehicle's alleged excessive power coupled with an automatic transmission.

the Defendants are grounded in design defect theories involving the subject vehicle's safety systems, including the air bag and seat belt as well as the vehicle's engine/transmission. These claims will be addressed separately.

### A.       Engine/Transmission

Defendants argue that Plaintiff's uncontrollable lunge theory as a design defect is unsupported by any evidence and is based on pure conjecture. Moreover, it is Defendants' contention that Plaintiff is unqualified to opine as an expert on accident reconstruction. In response, Plaintiff maintains that an automatic downshift causing the car to lunge out of its lane is supported by the record and that he is more than qualified to opine as to the cause of the accident.

The Court is compelled to first address Plaintiff's request that the Court strike the statements made by Defendants' engineer, Lawrence Fleming, and any motions based on Fleming's statements. *See* Pl.'s Opp. to Defs.' Mot. For Summ. J. ("Pl.'s Mem.") at 10-11. Throughout his opposition, Plaintiff argues that Fleming is unqualified to opine on structural analyses in light of the fact that he holds a degree in Chemical Engineering. In determining the admissibility of expert evidence, courts undertake a two-part inquiry. First, the court must assess whether the witness is qualified as an expert through his "knowledge, skill, experience, training or education." Fed. R. Evid. 702. Second, the court must decide whether the offered evidence is reliable and relevant. *See Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 589-90 (1993). Plaintiff's argument regarding Fleming's credentials only calls into question the first part of the inquiry.

As already noted, a witness can be qualified as an expert witness through his "knowledge, skill, experience, training *or* education." Fed. R. Evid. 702 (emphasis added). "An expert who has the requisite minimal education and experience in the relevant field is not barred from testifying 'merely because he or she lacks a degree or training narrowly matching the point of dispute in the lawsuit.'" *Rupolo v. Oshkosh Truck Corp.*, No. 05-CV-02978, 2009 WL 6547339, at *5 (E.D.N.Y. Oct. 27, 2009) (quoting *Canino v. HRP, Inc.,* 105 F. Supp. 2d 21, 27 (N.D.N.Y. 2000)). Although Plaintiff correctly points out that Fleming received a BS in Chemical Engineering from the University of Maryland in 1980, Plaintiff fails to acknowledge the over 25 years of engineering experience Fleming has in the auto industry. *See* Decl. of Lawrence Fleming in Supp. of Defs.' Mot. for Summ. J. ("Fleming Decl.") Ex. A. Prior to working for the Defendants, Fleming was a product engineer for Chrysler and Nissan. Fleming was also twice employed by the United States Department of Transportation in the National Highway Traffic Safety Administration both in the office of vehicle safety compliance and the office of safety standards and regulations. For the past 8 years, Fleming has been a Products Analysis Engineer for Mercedes-Benz performing vehicle compliance and analysis. In fact, Fleming's "experience and training in failure analysis and the determination of injury causation includes performing crash tests at Chrysler Corporation, and being the lead engineer in the investigation into numerous automobile accidents as a Product Analysis Engineer at MBUSA." Fleming Decl. ¶ 2. Since Fleming's over 25 years of experience and training as an engineer in the automotive industry more than compensates for any alleged lack of education in the specific field, Plaintiff's challenge to Fleming's status as an expert witness is without merit.[6]

_____

6      This finding equally applies to Plaintiff's challenge to Defendants' use of Fleming's declaration in opposition to the other asserted design defect claims.

As to whether Plaintiff has offered sufficient evidence upon which a reasonable jury could conclude that there was a design defect which caused the uncontrollable lunge reaction, the Court finds that he has not. To establish liability on a design defect theory, specific elements must be alleged and supported by particular evidence. To survive a motion for summary judgment in a design defect action, a plaintiff must offer sufficient evidence upon which a reasonable jury could conclude that "(1) the product, as designed, posed a substantial likelihood of harm; (2) it was feasible to design the product in a safer manner; and (3) the defective design was a substantial factor in causing the plaintiff's injury." *Rupolo v. Oshkosh Truck Corp.*, 749 F. Supp. 2d 31, 42 (E.D.N.Y. 2010).

### 1. Risk-Utility Test

The first two requirements for establishing a design defect claim form a standard known as the risk-utility test whereby the plaintiff "is under an obligation to present evidence that the product, as designed, was not reasonably safe because there was a substantial likelihood of harm and it was feasible to design the product in a safer manner." *Id.* (quoting *Voss*, 59 N.Y.2d at 108). Therefore, under the risk-utility test, Plaintiff must present evidence that the transmission of the CL 55 was not reasonably safe by balancing the "foreseeability and gravity of the harm created by the product with the feasibility of a more safe design." *Del Cid v. Beloit Corp.*, 901 F. Supp. 539, 545 (E.D.N.Y. 1995). It is not enough for a plaintiff to simply demonstrate that a product is dangerous. *See Cuntan v. Hitachi Koki USA, Ltd.*, 06-CV-3898, 2009 WL 3334364, at *5 (E.D.N.Y. Oct. 15, 2009). Instead, "in order to make out a prima facie case (and to raise a genuine issue of fact when confronted with a motion for summary judgement), [a plaintiff] must present some admissible evidence that there exists a technologically feasible and commercially

practicable alternative design" that would have reduced or prevented the harm sustained by the plaintiff. *Guarascio v. Drake Assocs. Inc.*, 582 F. Supp. 2d 459, 463 (S.D.N.Y. 2008). First, hwoever, "under New York law, a plaintiff seeking to establish a design defect is required to provide expert testimony as to the feasibility and efficacy of alternative designs." *Maxwell v. Howmedica Osteonics Corp.*, 713 F. Supp. 2d 84, 91 (N.D.N.Y. 2010); *Rypkema v. Time Mfg. Co.*, 263 F. Supp. 2d 687, 693 (S.D.N.Y. 2003) ("[A]n expert is required to ascertain feasibility, to test alternative designs, and to address the engineering factors and tradeoffs that go into the design of a product for distribution in the marketplace."). The only exception to this rule is if "a reasonable alternative design is both obvious to and understandable by a layperson." *Maxwell,* 713 F. Supp. 2d at 91*; accord Guarascio*, 582 F. Supp. 2d at 463 (finding that "the absence of expert testimony is fatal to a case unless a reasonable alternative design is both obvious to, and understandable by, a layperson").

In this case, Plaintiff has not proffered any expert testimony on the feasibility of an alternative design.[7] Moreover, the exception to requiring expert testimony would not apply to an alleged design defect involving a vehicle's transmission since a lay person would neither readily understand nor find obvious the design behind such a piece of machinery. In fact, New York courts have required non-conclusory expert testimony involving much more simplistic designs than an auto transmission. *See, e.g., Tuosto v. Philip Morris USA Inc.*, 05-CV-9384, 2007 WL

---

[7]    In fact, Plaintiff has not offered *any* alternative design regarding the alleged transmission defect. Instead, Plaintiff makes the conclusory and unsupported statement that "since there are numerous ways to electronically restrict the power applied upon an automatic downshift, a technical evaluation needs to be performed before recommending just one corrective method." Pl.'s Mem. at 8. Clearly, this assertion is not sufficient to overcome a motion for summary judgment. *See Guarascio*, 582 F. Supp. 2d at 462 (finding that "a plaintiff must provide the availability of a (1) technologically feasible and (2) practical (3) alternative design that would have reduced or prevented the plaintiff's harm.").

2398507, at *12 (S.D.N.Y. Aug. 21, 2007) (dismissing design defect claim because plaintiff "[did] not introduce an expert to demonstrate that there actually was a feasible alternative to the cigarettes [he] smoked"); *Preston v. Peter Luger Enters., Inc.*, 51 A.D.3d 1322, 1323, 858 N.Y.S.2d 828, 831 (3d Dep't 2008) (finding proffered expert testimony involving the design of a steak sauce bottle insufficient).

Plaintiff's attempt to proffer his own testimony as "expert testimony" is also unavailing. Putting aside the issues associated with having a plaintiff also serve as his own expert witness,[8] the Court does not find Plaintiff to be qualified as an expert witness under Fed. R. Evid. 702 to present the testimony regarding design defects in automobile transmissions. Similar to the Court's analysis with regard to Defendants' engineer, the mere fact that Plaintiff has a Bachelor's Degree in Environmental Engineering does not alone qualify Plaintiff as an expert. What is lacking is the necessary experience and training in the automotive industry generally, and product analysis specifically, to be qualified to offer the opinion testimony Plaintiff is seeking to introduce. Since Plaintiff has failed to proffer expert testimony as to a feasible alternative design to the CL 55 transmission, the design defect claim fails on that basis alone.

However, the Court notes that Plaintiff also does not provide sufficient evidence to support the position that the product in question, as designed, created a substantial likelihood of harm. Focusing all of his attention on persuading the Court that the accident was caused by the vehicle at issue, Plaintiff puts the cart before the horse in failing to present evidence that the product posed a substantial likelihood of harm. Although this design defect claim was not

---

[8]      After researching this issue, the Court has not found any case which explicitly prohibits a plaintiff from also serving as an expert witness under the right set of circumstances. Those circumstances, however, do not exist here.

artfully pled, it is important to note that the precise design defect Plaintiff points to involves an unrestricted automatic downshift capability of the vehicle. After reviewing the submitted record, the Court is unable to find a scintilla of evidence to support the position that the implicated portions of the CL 55 (*i.e.* transmission and engine) posed a substantial likelihood of harm. Indeed, Plaintiff has neither identified any regulation, standard, or the like with which the CL 55 did not comply. Nor has Plaintiff provided any evidence showing that Defendants were aware of any risk posed by the transmission and engine of the CL 55. *Cf. Rupolo*, 2009 WL 6547339, at *8 (finding that plaintiff "identified safety regulations and standards with which the ladder does not comply, and [plaintiff] has demonstrated that [defendant] was aware that at least some risk was posed by the support bracket position"). Instead, the only "evidence" presented by Plaintiff that the Court finds to have any bearing on the issue of substantial likelihood of harm is Plaintiff's self-serving affidavits which merely lay out the specifics of the CL 55, which include a "5.5 liter V-8 engine with 493 horsepower and 516ftlbs of torque." *See* Third Aff. of Mark Patrick Soliman in Supp. of Pl.'s Opp. to Defs.' Mot. for Summ. J. ("Soliman Aff. III") at 5. Clearly, this information standing alone, does not equate to a substantial likelihood of harm.

Due to the lack of sufficient evidence, and expert testimony in particular on the issue of whether the design of the CL 55 was not reasonably safe, Plaintiff's claim must fail. *See Nelson v. Ranger, Inc.*, No. 05-CV-0093, 2009 WL 3851622, at *4 (N.D.N.Y. Nov. 17, 2009) ("Through the introduction of his expert's testimony and his physical injuries, Plaintiff has presented specific record evidence that the Pump is not reasonably safe."); *Wengenroth v. Formula Equip. Leasing, Inc.*, 11 A.D.3d 677, 680, 784 N.Y.S.2d 123, 126 (2d Dep't 2004) ("Where, as here, a qualified expert opines that a particular product is defective or dangerous, describes why it is

dangerous, explains how it can be made safer, and concludes that it is feasible to do so, it is usually for the jury to make the required risk-utility analysis."). As such, the Court respectfully recommends to Judge Feuerstein that summary judgment be granted in Defendants' favor regarding this design defect claim.

### 2. *Causation*

A plaintiff "is required to show that the defectively designed product caused his injury and that the defect was the proximate cause of the injury." *Voss*, 59 N.Y.2d at 109. To survive summary judgment on this element, all that is required is for a plaintiff "to present admissible evidence upon which a trier of fact could reasonably find that the design defect" caused the plaintiff's injuries. *Rupolo*, 749 F. Supp. 2d at 45. Therefore, a plaintiff need not prove that the defective design is the sole proximate cause, only that it was a substantial factor. *Id.* The parties here focused much of their attention on the cause of Plaintiff's injuries. However, in light of the fact that the Court has concluded that Plaintiff failed to provide sufficient evidence to satisfy the first two elements necessary to survive summary judgment on a design defect claim, the Court need not decide whether the alleged defective design was a substantial factor in causing Plaintiff's injury. *See Maxwell*, 713 F. Supp. 2d at 94.

### B. Seatbelt/Seatback

Another design defect alleged by Plaintiff is in the integrated seatbelt system utilized by the Defendants in the subject vehicle. Specifically, this claim is predicated on the argument that the CL 55 "overpowered its front seat back's structural capacity resulting in a passenger seat back [to] ben[d] forward by 30-degrees without imposing a notable shoulder injury to the Plaintiff." Hannigan Decl. Ex. H. First, Defendants argue that any design defect regarding

13

integrated seatbelts is pre-empted.  Second, Defendants argue that Plaintiff's seat deformity was not caused by the shoulder belt being anchored to it.  Instead, Defendants claim the seat was deformed when it was struck by the unbelted rear occupant during the crash.   Lastly, Defendants maintain that Plaintiff's lay opinion is not enough to survive summary judgment.   In opposition, Plaintiff claims that he has presented "overwhelming evidence" that the integrated seatbelt was defectively designed and the seatback failed due to the passenger's own weight.  Furthermore, Plaintiff argues that Defendants' engineer, who submitted a declaration in support of summary judgment, is not educated enough in the subject of structures to comment.

### 1.  Pre-emption

As an initial matter, Plaintiff's design defect claim regarding the integrated seatbelt system is pre-empted by federal law.  Relevant to this action are various Federal Motor Vehicle Safety Standards promulgated by the Department of Transportation under the authority of the National Traffic and Motor Vehicle Safety Act of 1966 ("Safety Act"), 49 U.S.C. § 30101, *et seq*.  Contained within the Safety Act is a pre-emption clause which states that when a motor vehicle safety standard is in effect, a State may "prescribe or continue in effect a standard applicable to the same aspect of performance of a motor vehicle or motor vehicle equipment only if the standard is identical to the standard prescribed under this chapter."  49 U.S.C. § 30103(b)(1).  However, a State may proscribe a standard for a motor vehicle "that imposes a higher performance requirement than that required by the otherwise applicable standard under this chapter." *Id.*  Notwithstanding this pre-emption clause, the Safety Act also contains a savings clause which preserves those state tort actions that seek to establish greater safety

standards.  *See* 49 U.S.C. § 30103(e) ("Compliance with a motor vehicle safety standard prescribed under this chapter does not exempt a person from liability at common law.").

Therefore, reading the two clauses together, the Supreme Court determined that the "express pre-emption clause cannot pre-empt the common-law tort action; but neither can the statute's saving clause foreclose or limit the operation of ordinary conflict pre-emption principles."  *Williamson v. Mazda Motor Of Am., Inc.*, --- U.S. ----, 131 S. Ct. 1131, 1136 (2011).  Conflict pre-emption occurs "when compliance with both state and federal law is impossible, or when the state law stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress."  *Pac. Capital Bank, N.A. v. Connecticut*, 542 F.3d 341, 351 (2d Cir. 2008); *accord Marsh v. Rosenbloom*, 499 F.3d 165, 177 (2d Cir. 2007).

Of importance to this Court's decision whether Plaintiff's claim is pre-empted is Federal Motor Vehicle Safety Standard ("FMVSS") 208 which governs occupant crash protection. FMVSS 208 requires that passenger cars manufactured on or after September 1, 1996 have "a Type 2 seat belt assembly[9] that conforms to Standard No. 209 and S7.1 through S7.3 of this standard."  49 C.F.R. § 571.208.S4.1.5.1(a)(3).  Section 7 of Standard 208, which establishes the requirements in connection with seat belt assembly, provides for certain requirements where a Type 2 seat belt assembly is installed "[a]t a seat which is adjustable fore and aft while the vehicle is in motion and whose seat frame above the fore-and-aft adjuster is part of each of the assembly's seat belt anchorages."[10]  49 C.F.R. § 571.208.S7.1.2.2(a).  The requirements for when

---

9    "A Type 2 seat belt assembly is a combination of pelvic and upper torso restraints."  49 C.F.R. § 571.209.S3.  A Type 2 seat belt is what was installed in the front passenger seat of the 2003 CL 55.

10    "Seat belt anchorage means any component, other than the webbing or straps, involved in transferring seat belt loads to the vehicle structure, including, but not limited to, the attachment

a seat belt is anchored to the seat structure, referred to as an integrated safety belt assembly, differs from when a seat belt assembly is anchored elsewhere. *See* 49 C.F.R. § 571.208.S7.1.2.

The Court also notes two additional Standards which provide for seat belt anchorage to the car seat itself. Within FMVSS 210, governing seat belt assembly anchorages, Section 4.3 sets forth requirements for the location of seat belt anchorage for Type 2 seat belts. *See* 49 C.F.R. § 571.210.S4.3. However, the requirements vary based on three options available to the manufacturer: (1) an installation in which the seat belt does not bear upon the seat frame; (2) an installation in which the belt does bear upon the seat frame; and (3) an installation in which the seat belt attaches to the seat structure. 49 C.F.R. § 571.210.S4.3.1.1-1.3. Lastly, FMVSS 207, governing seating systems, also contains specific requirements where "a seat belt assembly attache[s] to the seat." 49 C.F.R. § 571.207.S4.2(c).

The various standards quoted above establish that manufacturers have the option of anchoring a Type 2 seat belt to the seat of the vehicle. The Supreme Court in *Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000) was faced with a similar question of whether a defective design claim – in that instance, the lack of an air-bag – conflicted with FMVSS 208. In concluding that the design defect claim was pre-empted in light of the language of FMVSS 208 which allows a manufacturer the choice among different passive restraint mechanisms, the Supreme Court reasoned that

> petitioners' tort action depends upon its claim that manufacturers had a duty to install an airbag when they manufactured the 1987 Honda Accord. Such a state law-*i.e.*, a rule of state tort law imposing such a duty-by its terms would have required manufacturers of all similar cars to install airbags rather than other

---

hardware, seat frames, seat pedestals, the vehicle structure itself, and any part of the vehicle whose failure causes separation of the belt from the vehicle structure. 49 C.F.R. § 571.210.S3.

passive restraint systems, such as automatic belts or passive interiors. It thereby would have presented an obstacle to the variety and mix of devices that the federal regulation sought.

*Geier*, 529 U.S. at 881. The presence of options for manufacturers within the various Standards led subsequent courts to also find conflict pre-emption applicable. *See Griffith v. Gen. Motors Co.*, 303 F.3d 1276, 1282 (11th Cir. 2002) (finding that plaintiff's claim that the defendant's selection of a lap belt only design constituted a design defect "would foreclose an option specifically permitted by FMVSS 208. Therefore, it conflicts with that federal law and is impliedly preempted."); *Hurley v. Motor Coach Indus., Inc.*, 222 F.3d 377, 383 (7th Cir. 2000) ("[W]hen a Federal Motor Vehicle Safety Standard leaves a manufacturer with a choice of safety device options, a state suit that depends on foreclosing one or more of those options is preempted."); *but see Noveck v. PV Holdings Corp.*, 742 F. Supp. 2d 284, 294 (E.D.N.Y. 2010) (finding that since FMVSS 208 does not include a side curtain airbag requirement or option, "allowing plaintiff's claims to proceed would likely 'advance-not thwart' the statutory and regulatory purpose of the Safety Act and FMVSS 208").

However, more than 10 years after *Geier,* the Supreme Court in *Williamson* again took up the issue of whether tort actions which seek to foreclose an option provided to manufacturers within the Federal Motor Vehicle Safety Standards are pre-empted. Like *Geier*, the court in *Williamson* dealt specifically with FMVSS 208, this time analyzing a specific regulation which "gave manufacturers a choice among two different kinds of seatbelts for rear inner seats" and a lawsuit premised on "a failure to install a particular kind of seatbelt [that] would in effect deprive the manufacturer of that choice." *Williamson*, 131 S. Ct. at 1134. In concluding that the lawsuit did not stand as an obstacle to federal law, even though the state tort suit may restrict a

manufacturer's choice of seatbelts for rear inner seats, the Supreme Court substantially narrowed the application of *Geier* by the lower courts.[11]  *Id.* at 1139-40.  The distinction drawn between *Williamson* and *Geier* was that "[a]t the heart of *Geier* lies our determination that giving auto manufacturers a choice among different kinds of passive restraint devices was a *significant objective* of the federal regulation."  *Williamson,* 131 S. Ct. at 1136.  By contrast, in *Williamson*, the Supreme Court did not believe that the restriction on choice was a significant regulatory objective.  *Id.* at 1137.  In showing that the choice among the different passive restraint devices was a significant objective in *Geier*, the Supreme Court referenced "DOT's contemporaneous explanation of its 1984 regulation [which] made clear that manufacturer choice was an important means for achieving its basic objectives."  *Id.* at 1137.

The recent holding in *Williamson* does not change the fact that Plaintiff's design defect claim conflicts with federal law, and is therefore pre-empted.  Despite Plaintiff's gradual shift from claiming the seat belt was defective to now stating that the seat back was defective, the design defect claim is premised on the contention that the seat belt should have been anchored to the car's frame as opposed to its seat.  The federal regulations do not mandate how a seat belt is to be anchored.  Rather, it provides options whereby manufacturers must then meet specific requirements based on the chosen anchorage.  These anchorage options were not arbitrarily provided for by the DOT, but, rather, were part of an important regulatory objective.  When FMVSS 208 was amended in 1994, the DOT expressly stated that the purpose of the amendment was to

---

11      Indeed, Justice Sotomayor filed a separate opinion "only to emphasize the Court's rejection of an overreading of *Geier* that has developed since that opinion was issued. *Williamson*, 131 S. Ct. at 1140 (Sotomayor, J., concurring)

require that Type 2 safety belts installed for adjustable seats in vehicles with a gross vehicle weight rating of 10,000 pounds or less either be integrated with the vehicle seat or be equipped with a means of adjustability to improve the fit and increase the comfort of the belt for a variety of different sized occupants. NHTSA believes that some occupants who find their safety belts to be uncomfortable react to their discomfort either by wearing their safety belts incorrectly or by not wearing them at all. NHTSA believes that improving safety belt fit will encourage the correct use of safety belts and could increase the overall safety belt usage rate.

59 Fed. Reg. 39472 (1994). DOT's contemporaneous explanation of the amendment to FMVSS 208, coupled with the presence of integrated seat belt assembly in FMVSS 209 and 210 leads this Court to conclude that this option was a significant objective of the federal regulation. As such, Plaintiff's claim, which seeks to foreclose the option of anchoring a Type 2 seat belt to the seat, stands as an obstacle to the accomplishment and execution of the full purpose of the federal regulations.

### 2. *Design Defect*

Notwithstanding the fact that Platiniff's claim is pre-empted, Soliman has also failed to offer any competent proof of either a design defect with regard to the seat belt or enhanced injuries attributable to the defect. In second collision cases, a plaintiff has the burden of not only proving the existence of a design defect, which includes a showing that an alternative safer design was feasible, but the Plaintiff must also prove "the extent of enhanced injuries attributable to the defect." *Tiner*, 909 F. Supp. at 116. Evidence of the enhanced injuries "will generally, perhaps even necessarily, be in the form of expert testimony." *Caiazzo*, 647 F.2d at 250.

Fatal to this claim, as is the case with Plaintiff's other design defect claims, is Plaintiff's lack of competent proof of the existence of a design defect, with supporting expert testimony

being paramount to such a showing. Plaintiff's evidence of the alleged design defect is confined to (1) his own affidavits, which claim that the seat belt and seat back allowed him to move forward and make contact with the dashboard after the collision, and (2) photographs taken by the police of the accident scene.[12] However, the only photo which captures the interior of the front passenger seat and seat belt does not offer any support that the seat belt, attached to the seat back, was defectively designed. In addition, Plaintiff's *own* testimony about his movements after the collision is not the type of evidence required to survive a motion for summary judgment. *See Tiner,* 909 F. Supp. at 117. "[C]ertain issues, because of their scientific or technical complexity, require the special expertise of an expert witness." *Food Pageant, Inc. v. Consol. Edison Co.*, 54 N.Y.2d 167, 173, 445 N.Y.S.2d 60, 429 N.E.2d 738 (1981). "Matters such as the tolerance a seat belt should allow for movement after a collision are not within the ken of the average juror" and are precisely the type of issue which requires expert testimony. *Tiner*, 909 F. Supp. at 117. Since, as discussed *supra*, Plaintiff's proffered testimony cannot be considered expert testimony, Plaintiff has failed to provide sufficient evidence of the existence of a design defect.

Moreover, Plaintiff has not presented any evidence, expert or otherwise, of enhanced injuries specifically tied to the alleged seat belt design defect, which injuries purportedly would not have occurred if the collision had not taken place. Even had there been identifiable support for enhanced injuries, Defendants' expert points to a logical source to which such injuries can be attributed. Specifically, Defendants' engineer points to damage to the upper, inboard portion of the front passenger seatback. According to the engineer, that damage was the result of "the

---

12      The photographs which accompanied the police case report were annexed to Plaintiff's Second Amended Complaint.

seatback being struck on the inboard side by a heavy object, which in this case was the unrestrained rear seat occupant." Fleming Decl. ¶ 12. The Plaintiff acknowledges this occurrence when he states that "[t]he rear-seat passenger, Wayne Forman's right shoulder first impacted my left shoulder/top of the inboard side of my seat back as he flew to the dashboard." Second Aff. of Mark Patrick Soliman in Supp. of Pl.'s Opp. to Defs.' Mot. for Summ. J. ("Soliman Aff. II"), ¶ 28.

This lack of competent proof of either a design defect or enhanced injuries attributable to the design defect leaves this Court with no alternative but to recommend to Judge Feuerstein that summary judgment be granted to the Defendants on this claim.

### C.    Airbag

Similar to Plaintiff's alleged design defect with the integrated seat belt, Plaintiff also claims that the vehicle "overpowered its airbag-accelerometer's ability to sense deceleration," which resulted in a delayed deployment of the airbag after the initial impact. *See* Hannigan Decl., Ex. H (Pl.'s Responses to Defs.' Interrogatories). According to the Defendants, there is no evidence that the air bag did anything other than properly deploy. Indeed, Defendants contend that a vehicle's torque and/or horsepower does not affect the ability of crash sensors to sense deceleration. Notwithstanding that fact, Defendants again maintain that Plaintiff's lay opinion cannot survive summary judgment on this claim. Plaintiff, on the other hand, maintains that he has presented sufficient evidence – including the autopsy report of Don Bonifazio and Plaintiff's medical records – that the air bag did not deploy properly resulting in Plaintiff's contact with the dashboard. In attempting to discredit Defendants' engineer, the Plaintiff argues that acceleration is a force that counters an accelerometer's ability to sense deceleration.

Therefore, according to Plaintiff, Defendants' use of the same accelerometers found in less powerful base-models was the result of the delayed deployment.

Since Plaintiff's supporting evidence on this claim is in the same form as that offered to support prior design defect claims already addressed by this Court, those repeated deficiencies need only be briefly discussed here. For one, the opinion of an expert is necessary when it comes to the design and functioning of an air bag. *See Fitzpatrick v. Currie*, 52 A.D. 3d 1089, 1092, 861 N.Y.S.2d 431 (3d Dep't 2008) ("While the opinion of an expert may not always be necessary in establishing a products liability case, the complex issues involved in the design and operation of an air bag make expert proof imperative, especially, where–as here–[defendant's] motion is supported by the opinion of an expert."). Here, Plaintiff's non-expert testimony falls short of the required proof, especially in the face of Defendants' expert opining that "[v]ehicle torque or horsepower will not interfere whatsoever with the crash sensor's ability to detect levels of deceleration associated with front crash events." Fleming Decl. ¶ 11.

Next, Plaintiff offers no evidence of a feasible alternative design to the accelerometers alleged to be defective. Instead, Plaintiff merely criticizes Defendants' use of the same accelerometers found in less powerful models. Lastly, "[E]vidence relating to [ ] alleged injuries, however, without more, is simply insufficient to set forth a basis for strict liability on the part of defendant in the design of the product." *Viscusi v. Proctor & Gamble*, NO. 05-CV-01528, 2007 WL 2071546, at *10 (E.D.N.Y. July 16, 2007). Plaintiff's medical records, offered as proof of the design defect of the air bag is therefore insufficient. In light of these findings, this Court respectfully recommends to Judge Feuerstein that summary judgment be granted in favor of the Defendants on this claim as well.

**VI.** **CONCLUSION**

For the reasons discussed above, I respectfully recommend to Judge Feuerstein that

Defendants' motion for summary judgment be GRANTED.  Counsel for Defendants is directed

to serve a copy of this Report and Recommendation upon the Plaintiff *pro se* forthwith and to

file proof of service on ECF.


Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from service of this Report and

Recommendation to file written objections.  *See also* Fed. R. Civ. P. 6(a) and (e).   Such

objections shall be filed with the Clerk of the Court via ECF, **except in the case of a party**

**proceeding** ***pro se***.   ***Pro Se* Plaintiff Mark Soliman  must file his objections in writing with**

**the Clerk of the Court within the prescribed time period noted above.  A courtesy copy of**

**any objections filed is to be sent to the chambers of the Honorable Sandra J. Feuerstein,**

**and to my chambers as well.  Any requests for an extension of time for filing objections**

**must be directed to Judge Feuerstein prior to the expiration of the (14) day period for filing**

**objections.  Failure to file objections will result in a waiver of those objections for purposes**

**of appeal.  *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Beverly v. Walker*, 118 F.3d 900, 901 (2d**

**Cir.), *cert. denied*, 522 U.S. 883 (1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir.**

**1996).**


**SO ORDERED.**

Dated:  Central Islip, New York
         August 8, 2011

_/s/ A. Kathleen Tomlinson_
A. KATHLEEN TOMLINSON
U.S. Magistrate Judge